Fill in this information to identify the case:

Debtor Name: MICHAEL JACQUES JACOBS f/d/b/a MICHAEL JACOBS PHOTOJOURNALISM

United States Bankruptcy Court for the: District of New Mexico

Case number:   19-12591-j11

**FILED**
at 4:05 o'clock P M

SEP 3 0 2021

**United States Bankruptcy Court**
**Albuquerque, New Mexico**
☐ Check if this is an amended filing

# Disclosure Statement for Small Business Under Chapter 11

## Michael Jacques Jacobs disclosure statement, dated September 30, 2021

PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  IT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THIS  CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 30, 2021.  THE PROPONENT BELIEVES THAT THIS PLAN IS IN THE BEST INTEREST OF THE CREDITORS AND IS FAIR AND EQUITABLE.  THE PROPONENT URGES THE VOTER TO VOTE TO ACCEPT THE PLAN.

## Table of Contents

I. Introduction ............................................................................................................................. 2
  A. Purpose of This Document ................................................................................................. 2
  B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ........................... 3
  C. Disclaimer ......................................................................................................................... 3
II. Background ............................................................................................................................ 3
  A. Description and History of the Debtor's Business .............................................................. 3
  B. Insiders of the Debtor ........................................................................................................ 5
  C. Management of the Debtor During the Bankruptcy ............................................................ 5
  D. Events Leading to Chapter 11 Filing ................................................................................. 5
  E. Significant Events During the Bankruptcy Case ................................................................ 7
  F. Projected Recovery of Avoidable Transfers ...................................................................... 7
  G. Claims Objections ............................................................................................................ 8
  H. Current and Historical Financial Conditions ...................................................................... 8
III. Summary of the Plan of Reorganization and Treatment of Claims and Equity Interests ....... 8
  A. What Is the Purpose of the Plan of Reorganization? ........................................................ 8
  B. Unclassified Claims .......................................................................................................... 8
    1. Administrative expenses, involuntary gap claims, and quarterly and Court fees .............. 8
    2. Priority tax claims ........................................................................................................... 9
  C. Classes of Claims and Equity Interests ............................................................................ 9
    1. Classes of secured claims .............................................................................................. 9
    2. Classes of priority unsecured claims .............................................................................. 11
    3. Classes of general unsecured claims ............................................................................. 11
    4. Classes of equity interest holders .................................................................................. 13
  D. Means of Implementing the Plan ...................................................................................... 13
    1. Source of payments ....................................................................................................... 13
    2. Post-confirmation Management ...................................................................................... 13
  E. Risk Factors ..................................................................................................................... 13

F. Executory Contracts and Unexpired Leases................................................................................. 13

G. Tax Consequences of Plan .......................................................................................................... 14

IV. Confirmation Requirements and Procedures............................................................................... 14

A. Who May Vote or Object ............................................................................................................. 14

1. What is an allowed claim or an allowed equity interest? ..................................................... 15
2. What is an impaired claim or impaired equity interest? ....................................................... 15
3. Who is not entitled to vote................................................................................................... 15
4. Who can vote in more than one class ................................................................................. 15

B. Votes Necessary to Confirm the Plan ......................................................................................... 15

1. Votes necessary for a class to accept the plan .................................................................. 16
2. Treatment of non-accepting classes of secured claims, general unsecured claims, and interests........................ 16

C. Liquidation Analysis .................................................................................................................... 16

D. Feasibility .................................................................................................................................... 16

1. Ability to initially fund plan................................................................................................... 16
2. Ability to make future plan payments and operate without further reorganization.............. 16

V. Effect of Confirmation of Plan ..................................................................................................... 17

A. Discharge of Debtor.................................................................................................................... 17

B. Modification of Plan..................................................................................................................... 17

C. Final Decree................................................................................................................................ 17

VI. Other Plan Provisions ................................................................................................................. 17

Exhibit A:  Copy of Proposed Plan of Reorganization .....................................................................

Exhibit B: Identity and Value of Material Assets of Debtor...............................................................

Exhibit C: [Most Recently Filed Post-petition Operating Report].....................................................

Exhibit D: Liquidation Analysis ........................................................................................................

Exhibit E: Cash on hand on the effective date of the Plan ...............................................................

## I. Introduction

This is the disclosure statement (the Disclosure Statement) in the small business chapter 11 case of Michael Jacques Jacobs *f/d/b/a* Michael Jacobs Photojournalism (the "Debtor"). This Disclosure Statement provides information about the Debtor and the Reorganization Plan filed on September 30, 2021(the "Plan") to help you decide how to vote.

A copy of the Plan is attached as *Exhibit A.* **Your rights may be affected.** You should read the Plan and this Disclosure Statement carefully. You may wish to consult an attorney about your rights and your treatment under the Plan

The proposed distributions under the Plan are discussed at pages 9-12 of this Disclosure Statement.

### A. Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case;

- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.,* what you will receive on your claim or equity interest if the plan is confirmed);

- Who can vote on or object to the Plan;

- What factors the Bankruptcy Court (the "Court") will consider when deciding

whether to confirm the Plan;

▪ Why [the proponent] believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and

▪ The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

## B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. A separate order has been entered setting the following information:

▪ Time and place of the hearing to [finally approve this disclosure statement and] confirm the Plan,

▪ Deadline for voting to accept or reject the Plan, and

▪ Deadline for objecting to the [**adequacy of disclosure and**] confirmation of the Plan.

If you want additional information about the Plan or the voting procedure, you should contact: Michael Jacobs at 800 Calle Divina NE, Albuquerque, NM 87113.

## C. Disclaimer

**The Court has conditionally approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.**

## II. Background

### A. Description and History of the Debtor's Business

Individual Debtor, Michael Jacques Jacobs originally formed a sole-proprietorship company in the San Francisco Bay Area named Michael Jacobs Photojournalism ("MJP") in 1969 which began a professional career in photography that has lasted over 52 years. For almost two years working on newspapers and winning several awards, Canadian Debtor became an American citizen so that he could enlist in the U. S. Navy during the Vietnam War. He was a Petty Officer Second Class and a multiple award-winning Navy Enlisted Classified photojournalist ending up in Pacific Fleet Combat Camera Group. Debtor garnished the First Place Military Features award in the international Military Photos of the Year contest in 1973. Following his service, Debtor re-located to London, England and work three years on famed Fleet Street achieving publications of his images globally. Debtor moved to Los Angeles at the suggestion of a British editor and embarked on a 30-year pursuit capturing images of the Hollywood glitterati for publications, film and television companies, and clients such as celebrities, politicians, captains of industry, religious leaders, and Royalty.  Debtor was one of

three photographers who dominated the Hollywood event scene of that era. Debtor had Secret Service clearance as he was the photographer for several noted politicians including five U.S. presidents and candidates.  When the era of professional digital photography came into existence in the early 2000s and literally transformed the industry, Debtor found it more difficult to earn a living with his mainstay of shooting exclusive events. Debtor directed his first feature film ("Crab Orchard" now called "Sheeba") which was released in 2006 and garnished him the top award in the International Family Film Festival.

The direction of his business changed, however, when he left Hollywood and moved to New Mexico. After moving to New Mexico, Debtor turned his general attention to the New Mexico film industry.  MJP went semi-dormant during that time as Debtor focused on film production and industry services. Debtor was successful for a period, including the sole support with his wife and effectual passing of a 2006 bill to increase fair film production credits, with his film studio.  Unfortunately, Debtor's delving into the New Mexico film business was not profitable as his plans to expand his stake never came to full fruition due to political circumstances beyond his control, including the recession after the 2008 financial crash. Additionally, the Writer's Guild strike and pending strikes with the Producer's Guild and Screen Actors Guild hindered the progress.

Beginning in 2009 Debtor's film business had been "attacked" by a hate group as well as a "commercial terrorist" determined to "bomb" Debtor's business. As a result, Debtor and spouse suffered through an S.E.C. investigation instigated by the NM Attorney General's Office ("NMAGO") and were cleared.  After the couple was cleared, the NMAGO continued to investigate the same matter based on fabricated information which led to a perjury-filled grand jury indictment and subsequent dismissal of the charges after six years.  By this time Debtor and spouse lost their business and commercial film studio in which they had invested well over $1.5 Million.

Following this disaster, Debtor and spouse were unfairly accused of wrongdoing committed by a foreign citizen. The case was adjudicated in New York. After combing through millions of documents it was later realized and admitted that Debtor and spouse had been victims caught up in a white-collar conspiracy of this overseas mastermind perpetrator.  Debtor and spouse returned home at approximately the same time and thankful the ordeal was over.

Debtor retains his sterling reputation in the field of photography. In 2019, Debtor decided to reorganize MJP and seek photo assignments, but first had to obtain photo equipment due to the theft of his gear and most other possessions by house sitters.  Debtor's home insurance company denied his claim and he had to seek assistance elsewhere.  Upon receiving his first assignment in February 2020, Debtor rented photo equipment to complete the assignment.  Then he purchased basic equipment to continue seeking work. Currently he has just completed his year and a half contract for Albuquerque the Magazine and had a promising photo gallery showing in March 2021.  In line with general COVID-19 restrictions on all businesses, the processes have been slow, but future gallery dates are in the offing. Also currently, Debtor has created a book proposal with a New York Times bestselling author-publicist on Hollywood's most famous decade-long Oscar night parties.  Nevertheless, Debtor remains positive in these endeavors and is using the studio in his home as it is necessary for freelance photographic shoots despite the hindrance of Debtor's restructuring due to the intense legal procedures in the instant bankruptcy.

### B. Insiders of the Debtor

NA - Debtor does not have any insiders

### C. Management of the Debtor During the Bankruptcy

List the name and position of all current officers, directors, managing members, or other persons in control (collectively the *Management*) who will not have a position post-confirmation that you list in III D 2.

N/A - Debtor is a sole proprietor

### D. Events Leading to Chapter 11 Filing

After moving to New Mexico in 2004, Debtor and spouse turned their attention to the New Mexico film industry, purchasing a film studio and a new home. We came to learn this industry was not as friendly as presented and the couple were then persecuted by zealous locals who lied to us in inducing us to move here. However, Debtor and spouse did whatever was possible to grow the industry as evidenced by their efforts to bring in production to the State. Their efforts came to fruition in 2006 when they single-handedly beat the then current administration and had a bill passed that gave all incoming production companies a 25% film cash rebate. Their success is evidenced today by the billions of dollars the state has reaped for movies and TV productions filming here. However, this was not appreciated by the locals and the couple's business suffered.

The couple had an excellent business plan to expand their studio and build an entertainment complex in Rio Rancho with the city granting them the land. Debtor's friendship had allowed the creation of a team of Hollywood professionals to pursue the project. Unfortunately, although the couple raised funds to begin the project, they were thwarted by the city manager who took bribes from the film company at the center of the 2006 bill causing them to be overstepped and losing the land.

The couple then turned their attention to a new site in Santa Fe and in turn received the contractual promise of funding from an Arizona broker who unfortunately deceived them causing a dispute for a portion of land chosen for the project. Debtor had also received commitments for full funding but unfortunately the 2008 recession hit and all of those were lost.

Adding to their woes, in 2009, Debtor and spouse were attacked by a set of disgruntled producers who defaulted on their contract. Their lawsuit, which was dismissed against the couple but continues against Merrill Lynch 12 years later, led to the insertion of an overzealous NM Attorney General Office ("NMAGO") investigator who proceeded to destroy the couple's business over the next six years. Debtor and spouse learned that the investigator also went into business with the Iranian terrorist, a producer that "bombed" their business, to compete with Debtor's film studio services. In December 2009, Debtor and spouse were the subject of an S.E.C. investigation (later learned that it was at the behest of the NMAGO) which resulted in no action being taken. This did not sit well with the investigator and after a grand jury failed, he took a different course which led to false charges being filed against the couple three years later which were subsequently dismissed.

In the interim, Debtor's business 2010-2011, as well as the New Mexico film industry, suffered due to the Writer's strike and PGA/DGA/SAG pending strikes held up business.

The following year, and due to the loss of revenue caused by the above actions, Debtor's spouse was forced to file bankruptcy which resulted in the loss of their film studio. Moreover, their local studio attorney was acting contrary to NM bar ethics and undermined their business for his own benefit. Because of the lack of income, Debtor was forced to file an unwanted bankruptcy due to a threatened foreclosure of his Los Angeles home of nearly 30 years.

The Debtor and spouse had sought assistance from the mortgage servicers for the couple's home at 800 Calle Divina, NE, Albuquerque, as the interest rates on the mortgages were all well-above market rates at that time. By the end of 2010, with a previous servicer EMC Mortgage Corp., Debtor's spouse was on a federally approved Making Home Affordable Program, an official program of the Department of Treasury and HUD ("HAMP"). The modification plan became permanent in March 2011, which monthly payments included escrowed insurance and taxes. This lasted one year because that servicer then "transferred" the mortgage to another servicer, Nationstar Mortgage LLC ("Nationstar"), who refused the permanent modification. Debtor's spouse was forced to apply for Nationstar's own modification plan. After the acceptance and signing under duress, Nationstar refused to accept payments for that amount signed in the new modification. Nationstar then demanded a double (two years) escrow on top of the mortgage payment. They demanded a large amount over and above the permanent HAMP modification. This was tantamount to no modification at all. Following this dispute, the couple settled with Nationstar for a sum closer to the amount of the permanent modification, while deducting late fees, which brought the Jacobses current on their mortgage.

Without notifying the couple, Nationstar then "transferred" the mortgage to Selene Finance LP ("Selene LP"). Months later, when the couple first found out about Selene LP, they also refused to honor the permanent HAMP modification. All payments that the couple made to Selene LP were returned. Unknown to the couple, DLJ who claimed to be the owner of the mortgage and note, filed in New Mexico 2nd District Court a foreclosure action against the spouse and Debtor in 2012 prior to their filing an Assignment of Mortgage. This case was dismissed for lack of standing but was amended by DLJ and newly added Selene LP in 2014.

The couple has a history of settlements with disputes. However, during the continuing dispute with Selene LP and DLJ, the couple repeatedly attempted to pay off, refinance, mediate, or settle with Selene LP and/or DLJ unsuccessfully due to Selene LP and DLJ's total lack of response to any of the efforts by the couple, community assistance or counsels.

In 2011, the couple was referred to a foreign national, a "financial engineer," who convinced them, and their legal and financial team, that he had the ability to finance their entertainment development project along with several photo galleries for Debtor. The couple and team were fully persuaded that he would come through with this commitment and by 2013 began working with him to raise the needed funds through a program which was also approved by Bank of America. The relationship ended in 2016 when the couple learned that the financial engineer and his family stole all of the money raised for the project. Thus, Debtor and spouse were unwillingly and unknowingly caught up in the ruse until later discovered that they were victims. The case was out of New York.

In 2017, spouse and Debtor discovered their house sitters committed a massive theft at the Property which included the forging of business checks and absconding with most of their cash, stole cash in the home, and murdered their pets. They also stole one car and allowed other bills to not be paid resulting in repossession of two vehicles. The theft also resulted in the loss all Debtor's photographic gear, ancillary equipment, and some of his historical photo images. The loss also included most of the family's furnishing, all of their clothing and family

heirlooms. Their claim with the home insurance company was denied and the district attorney refused to pursue their claim for forgery as well as the theft. Also, Debtor's real property in Oregon became distressed during the above events where occupants damaged the property and has added this issue to the Plan.

In 2018 DLJ and Selene LP received a judgement for $442,555.93 which is now on appeal with the New Mexico Court of Appeals. Debtor has recently been advised by the HAMP that the permanent modification was required to be honored even after a transfer. Although Debtor was advised to file complaints with the Consumer Finance Protection Bureau, HUD, and the New Mexico Attorney General's Office, he has not done so.

These are the events that had led up to the filing of this Chapter 11 case resulting in continued attempts for resolution.

## E. Significant Events During the Bankruptcy Case

Describe significant events during the Debtor's bankruptcy case:

- Debtor did not have any asset sales outside the ordinary course of business.
- Debtor does not have any professionals approved by the court.
- Debtor has filed an Adversary action against DLJ; Selene Finance LP ("Selene LP"); Selene CS Participation, LLC; Nationstar Mortgage, LLC; Mortgage Electronic Registration Systems, Inc; U.S. Bank National Association; and Bank of New York Mellon.
- Debtor and NFS have filed a Trespassing, Theft and Copyright Infringement, action against the Albuquerque Journal in the U.S. District Court.
- United Van Lines, LLC filed a declaratory action in the Central District of California against Debtor and NFS which on hold due to the automatic stay.
- Debtor is a named defendant in a wrongful death action entitled *Lee Hunt as Personal Representative of the Estate of Mr. Wayne Tenorio et al v. Whataburger Restaurant, LLC*, et al. Debtor is a wrong party.
- Debtor and NFS are Appellants against DLJ and Selene LP in a stayed New Mexico State Court of Appeals action.
- Debtor has contested DLJ's Relief from Automatic Stay ruling in a pending Rule 60(b) action.
- Debtor has contested DLJ's Proof of Claim in a pending Rule 60(b) action.
- Debtor has filed a Motion for Declaratory Judgment against DLJ that is pending.
- Debtor completed a stimulus contract with Albuquerque the Magazine.
- Debtor has a book project pending and refining the proposal.
- Debtor held a gallery showing in March 2021.
- Debtor is seeking other venues to present his photographic collection.
- Debtor was forced to terminate the services of his attorney for being ineffective counsel.

## F. Projected Recovery of Avoidable Transfers

The Debtor has not yet completed its investigation with regard to prepetition transactions. If you

received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtor may seek to such transfer.

## G. Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. Disputed claims are treated in Article 5 of the Plan.

## H. Current and Historical Financial Conditions

- The identity and fair market value of the estate's assets are listed in *Exhibit B*.
- The Debtor's most recent financial statements [if any] issued before bankruptcy, each of which was filed with the Court. None Filed
- The most recent post-petition operating report filed since the commencement of the Debtor's bankruptcy case is set forth in *Exhibit C*.
- A summary of the Debtor's periodic operating reports filed since the commencement of the Debtor's bankruptcy case is set forth in *Exhibit C*.

## III. Summary of the Plan of Reorganization and Treatment of Claims and Equity Interests

## A. What Is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

## B. Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. Therefore, the Plan Proponent has *not* placed the following claims in any class:

### 1. Administrative expenses, involuntary gap claims, and quarterly and Court fees
Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 503(b) of the Code. Administrative expenses include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition, and compensation for services and reimbursement of expenses awarded by the court under § 330(a) of the Code. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment. Involuntary gap claims allowed under § 502(f) of the Code are entitled to the same treatment as administrative expense claims. The Code also requires that fees owed under section 1930 of title 28, including quarterly and court fees, have been paid or will be paid on the effective date of the Plan.

The following chart lists the Debtor's estimated administrative expenses, and quarterly and court fees, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|------|----------------------|--------------------|
| Administrative expenses | $0.00 | Paid in full on the effective date of the Plan, unless the holder of a particular claim has agreed to different treatment |
| Involuntary gap claims | $0.00 | Paid in full on the effective date of the Plan, unless the holder of a particular claim has agreed to different treatment |
| Statutory Court fees. | $0.00 | Paid in full on the effective date of the Plan |
| Statutory quarterly fees. | $250.00 | Paid in full on the effective date of the Plan |
| TOTAL: | $250.00 | |

## 1. Priority tax claims

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim pursuant to 11 U.S.C. § 511, in regular installments paid over a period not exceeding 5 years from the order of relief.

The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description | Estimated Amount | Date of Assessment | Treatment | |
|-------------|-----------------|-------------------|-----------|---|
| None | $ | | Payment interval | |
| | | | [Monthly] payment | $ |
| | | | Begin date | |
| | | | End date | |
| | | | Interest rate | % |
| | | | Total payout amount | $ |

## C.  Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### 1. Classes of secured claims

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will [be classified as a general unsecured claim].

The following chart lists all classes containing Debtor's secured prepetition claims and their proposed treatment under the Plan:

| Class # | Description | Impairment? | Treatment | |
|---|---|---|---|---|
| 1 A | Secure claim of:<br>DLJ Mortgage Capital, Inc.<br>(50% Beneficiary)<br>Collateral description:<br>800 Calle Divina NE<br>Albuquerque, NM 87113 | ☑ Impaired<br>☐ Unimpaired | [Monthly] payment | $1,520.00 |
| | | | December 1, 2021<br>Payments begin<br>November 30, 2051<br>Payments end | |
| | Allowed secured amount: $Unknown | | | |
| | Priority of Lien — Secured Priority | | [Balloon payment]<br>Negotiable | |
| | Principal Owed — $324,305.93 | | | |
| | Pre-pet. Arrearage — None/Unknown | | Interest rate | 2.8% |
| | | | Treatment of lien | Removal upon allowed full payment |
| | Total claim — $Unknown | | [Additional payment required to cure defaults] | $ Negotiable if allowed |
| 1 B | Secure claim of: (See Class 1A)<br>Selene CS Participation, LLC<br>(50% Beneficiary)<br>Collateral description:<br>800 Calle Divina NE<br>Albuquerque, NM 87113 | ☑ Impaired<br>☐ Unimpaired | [Monthly] payment | $1,520.00 (See Class 1A) |
| | | | December 1, 2021<br>Payments begin<br>November 30, 2051<br>Payments end | |
| | Allowed secured amount: $Unknown | | | |
| | Priority of Lien — Secured Priority | | [Balloon payment]<br>Negotiable | |
| | Principal Owed — $324,305.93 | | | |
| | Pre-pet. Arrearage — None/Unknown | | Interest rate | 2.8% |
| | | | Treatment of lien | Removal upon allowed full payment |
| | Total claim — $Unknown | | [Additional payment required to cure defaults] | $ Negotiable if allowed |
| 2 A | Secure claim of:<br>Vista del Norte Homeowners Assn<br>Collateral description:<br>800 Calle Divina NE<br>Albuquerque, NM 87113 | ☑ Impaired<br>☐ Unimpaired | [Monthly] payment | $21.44 |
| | | | November 1, 2021<br>Payments begin<br>October 31, 2024<br>Payments end | |
| | Allowed secured amount: $772.00 | | Note: Debtor is current on post-petition dues payments | |
| | Priority of Lien — Secured | | [Balloon payment]<br>None | |
| | Principal Owed — $772.00 | | | |
| | Pre-pet. Arrearage — None/ | | Interest rate | None% |
| | | | Treatment of lien | Removal upon payment of back dues |

| | | | | | |
|---|---|---|---|---|---|
| | Total claim | $Unknown [Additional | ☑ Impaired | [Monthly] payment | $300.00 |
| | payment | | ☐ Unimpaired | October 1, 2021 | |
| | Secur | | | Payments begin | |
| | | | | September 30, 2026 | |
| [Additional payment required to cure | $ Negotiable if allowed | | | Payments end | |

2 B

| | | | | |
|---|---|---|---|---|
| Secure claim of:) | | | | |
| Jefferson County Tax Collector | | | | |
| Collateral description: | | | | |
| 6333 SW Buckskin Lane | | | | |
| Terrebonne, OR 97760 | | | | |
| | | | | |
| Allowed secured amount: | $13,715.09 | | Note: Debtor will continue to make payments from the date of this Plan | |
| | | | | |
| Priority of Lien | Secured | | [Balloon payment] If any, negotiable | |
| Principal Owed | $10,357.67 | | | |
| Pre-pet. Arrearage | None | | Interest rate. | As required by law |
| | | | Treatment of lien. | Removal on payment of back taxes |
| Total claim | $Unknown | | | |

## 2. Classes of priority unsecured claims

The Code requires that, with respect to a class of claims of a kind referred to in §§ 507(a)(1), (4), (5), (6), and (7), each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim, unless a particular claimant agrees to a different treatment, or the class agrees to deferred cash payments.

The following chart lists all classes containing claims under §§ 507(a)(1), (4), (5), (6), and (7) of the Code and their proposed treatment under the Plan:

| Class # | Description | Impairment? | Treatment |
|---|---|---|---|
| | Priority unsecured claim pursuant to section [insert] | ☐ Impaired ☐ Unimpaired | |
| | Total amount of claims | $ Debtor has no claims under §§ 507(a)(1), (4), (5), (6), and (7) | |

## 3. Classes of general unsecured claims

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code. [Insert description of § 1122(b) convenience class if applicable.]

The following chart identifies the Plan's proposed treatment of four (4) classes which contain general unsecured claims against the Debtor:

| Class # | Description | Impairment? | Treatment |
|---|---|---|---|
| 4A | Non-priority Unsecured Claim: ACAR Leasing Ltd d/b/a GM Financing Leasing | ☑ Impaired ☐ Unimpaired | Dismissed or allowed 5% of claim paid in full, in cash, within 30 days of the effective date of the Plan. |
| 4B | Non-priority Unsecured Claim: Capital One Auto Finance | ☐ Impaired ☐ Unimpaired | Dismissed or allowed 5% of claim paid in full, in cash, within 30 days of the effective date of the Plan. |

| 4C | General unsecured class: LVNV Funding | ☑ Impaired ☐ Unimpaired |
|---|---|---|

| [date] | | |
|---|---|---|
| [Monthly] payment | $0.00 |
| Payments begin | |
| Payments end | |
| [Balloon payment] | $ |
| Interest rate from | % |
| [Monthly] payment | $0.00 |
| Payments begin | |
| Payments end | |
| [Balloon payment] | $ |
| Interest rate from | % |

| 4D | General unsecured class: Crooked River Ranch Homeowner Assn | ☑ Impaired ☐ Unimpaired |
|---|---|---|

| [date] | | |
|---|---|---|
| [Monthly] payment | $Unknown – no invoicing |
| Payments begin | |
| Payments end | |
| [Balloon payment] | $ |
| Interest rate from | % |

## 4. Classes of equity interest holders

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company (*LLC*), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The following chart sets forth the Plan's proposed treatment of the classes of equity interest holders: [There may be more than one class of equity interests in, for example, a partnership case, or a case where the prepetition Debtor had issued multiple classes of stock.]

| Class # | Description | Impairment? | Treatment |
|---|---|---|---|
| | Equity interest holders **NONE** | ☐ Impaired ☐ Unimpaired | |

## A. Means of Implementing the Plan

### 1. Source of payments

Payments and distributions under the Plan will be funded by the following:

Debtor's current monthly income and operations, a rental property, future income and from litigation settlements.

### 2. Post-confirmation Management

The Post-Confirmation Management of the Debtor (including officers, directors, managing members, and other persons in control), and their compensation, shall be as follows

| Name | Position | Compensation |
|---|---|---|
| Michael Jacobs | Manager | $100.00/month |

## B. Risk Factors

The proposed Plan has the following risks:

Debtor has steady base income that is not subject to downward fluctuation and therefore would not be impaired to prevent payments.

## C. Executory Contracts and Unexpired Leases

The Plan in Article 6 lists all executory contracts and unexpired leases that the Debtor will assume, and if applicable assign, under the Plan. *Assumption* means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to

cure defaults of the type that must be cured under the Code, if any. Article 6 also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

- ▣ Debtor will not assume any Executory Contracts or Expired Leases.

## D. Tax Consequences of Plan

**Creditors and equity interest holders concerned with how the plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.**

The following are the anticipated tax consequences of the Plan: [List the following general consequences as a minimum:

(1) Tax consequences to the Debtor of the Plan;

(2) General tax consequences on creditors of any discharge, and the general tax consequences of receipt of plan consideration after confirmation.]

## IV. Confirmation Requirements and Procedures

To be confirmable, the Plan must meet the requirements listed in §1129 of the Code. These include the requirements that:

- — the Plan must be proposed in good faith;
- — if a class of claims is impaired under the Plan, at least one impaired class of claims must accept the Plan, without counting votes of insiders;
- — the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and
- — the Plan must be feasible.

These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

## A. Who May Vote or Object?

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. Except as stated in Part IV.A.3 below, a creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 1 through 4 are impaired and that holders of approved claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that no classes are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 1. What is an allowed claim or an allowed equity interest?

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either

(1)  the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has beenscheduled as disputed, contingent, or unliquidated, or

(2)  the creditor has filed a proof of claim or equity interest unless an objection has been filedto such proof of claim or equity interest.

When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a)of the Federal Rules of Bankruptcy Procedure.

> **The deadline for filing a proof of claim in this case was July 21, 2020.**

### 2. What is an impaired claim or impaired equity interest?

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered *impaired* if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3. Who is not entitled to vote?

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;
- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;
- holders of claims that have not filed a Proof of Claim;
- holders of claims or equity interests in unimpaired classes;
- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;
- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and
- administrative expenses.

**Even if you are not entitled to vote on the plan, you have a right to object to the confirmation of the Plan [and to the adequacy of the Disclosure Statement].**

### 4. Who can vote in more than one class?

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity and should cast one ballot for each claim.

### B. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless:

(1)  all impaired classes have voted to accept the Plan; or

(2) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and the Plan is eligible to be confirmed by "cram down" of the non-accepting classes, as discussed later in Section B.2.

### 1. Votes necessary for a class to accept the plan

A class of claims accepts the Plan if both of the following occur:

(1) the holders of more than ½ of the allowed claims in the class, who vote, cast their votes to accept the Plan, and

(2) _____ the holders of at least ½ in dollar amount of the allowed claims in the class, who vote, cast
their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least ½ in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

### 2. Treatment of non-accepting classes of secured claims, general unsecured claims, and interests

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan upon the request of the Plan proponent if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds non-accepting classes is commonly referred to as a *cram down* plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not *discriminate unfairly*, and is *fair and equitable* toward each impaired class that has not voted to accept the Plan.

**You should consult your own attorney if a *cram down* confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.**

### c. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as *Exhibit E*.

### D. Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### 1. Ability to initially fund plan
The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the effective date of the Plan, and the sources of that cash are attached to this disclosure statement as *Exhibit E*.

### 2. Ability to make future plan payments and operate without further reorganization

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the debtor's business.
The Plan Proponent has provided projected financial information. Those projections are listed in *Exhibit G*.

The Plan Proponent's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes, of $15,309.94. The final Plan payment is expected to be paid on December 1, 2026 excluding mortgage payments which would most likely continue with another servicer.

## V. Effect of Confirmation of Plan

### A. Discharge of Debtor

**Discharge if the Debtor is an individual and 11 U.S.C. § 1141(d)(3) is not applicable.** Confirmation of the Plan does not discharge any debt provided for in the Plan until the court grants a discharge on completion of all payments under the Plan, or as otherwise provided in § 1141(d)(5) of the Code. Debtor will not be discharged from any debt excepted from discharge under § 523 of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

### B. Modification of the Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan.
Upon request of the Debtor, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before the completion of payments under the Plan, to

(1) increase or reduce the number of payments under the Plan on claims of a particular class,

(2) extend or reduce the time period for such payments, or

(3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.]

### C. Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## VI. Other Plan Provisions

None

By:_____          MICHAEL JACQUES JACOBS_____
[Signature of the Plan Proponent]          [Printed Name]