UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:   MICHAEL JACQUES JACOBS,                    No. 19-12591-j11

Debtor.

**<u>MEMORANDUM OPINION</u>**

On March 16, 2022, the United States Trustee ("UST") filed a motion to convert this
chapter 11 to a case under chapter 7 or alternatively to dismiss the case ("Motion to Convert or
Dismiss").[1] The UST requests the Court to convert Debtor's bankruptcy case to chapter 7 or
dismiss the case under 11 U.S.C. § 1112(b)[2] for cause, including Debtor's alleged bad faith and
Debtor's failure to file an acceptable plan within a reasonable time after commencement of this
chapter 11 bankruptcy case. The UST contends that Debtor's chapter 11 plan violates the anti-
modification prohibition in § 1123(b)(5). The Court held a final, evidentiary hearing over four
non-consecutive days and took the matter under advisement.[3] Debtor and his non-filing spouse,
Ruby Jacobs, represented themselves in the hearing without counsel. Jaime Pena appeared on
behalf of the UST. Elizabeth Dranttel, counsel for DLJ Mortgage Capital, Inc. ("DLJ"), attended
the final hearing but DLJ did not join in the Motion to Convert or Dismiss and did not participate
in the hearing.

---

[1] *See* Motion to Convert Chapter 11 Case to Chapter 7, or in the Alternative, to Dismiss (Doc. 233).
[2] All future references to "Code," "Section," and "§" are to Title 11 of the United States Code unless
otherwise indicated.
[3] The UST consented in its Motion to Convert or Dismiss to a hearing more than thirty days after filing
the motion. *See* 11 U.S.C. § 1112(b)(3) (requiring a hearing on a motion to dismiss or convert within 30
days of the filing of the motion "unless the movant expressly consents to a continuance . . . ."). Further,
because additional non-consecutive days were added to the final hearing to accommodate Debtor's
schedule and to allow Debtor to complete the presentation of his evidence, compelling circumstances
exist that prevented the Court from deciding the Motion to Convert or Dismiss within 15 days after
commencement of the hearing. *Id.*

Having considered the evidence and the relevant case law, the Court finds and concludes that cause exists to either convert Debtor's chapter 11 bankruptcy case to chapter 7 or dismiss the case because Debtor's plan, filed more than two and a half years after Debtor commenced this bankruptcy case, does not comply with the Code's requirements for treatment of a claim secured only by Debtor's principal residence. Under the circumstances, dismissal is in the best interests of creditors and the estate.

## GENERAL BACKGROUND AND PROCEDURAL HISTORY

Debtor commenced this voluntary case under chapter 11 of the Code on November 13, 2019. At that time Debtor was represented by counsel. Prior to the bankruptcy filing, on June 5, 2018, the Second Judicial District Court, State of New Mexico (the "State Court") entered a judgment in Case No. D-202-CV-2012-09237 (the "State Court Action") granting DLJ an in rem foreclosure judgment (the "Foreclosure Judgment") against Debtor's property located at 800 Calle Divina, Albuquerque, New Mexico, 87113 (the "Property"). Debtor filed an appeal of the Foreclosure Judgment. That appeal remains stayed by this bankruptcy case. Debtor has also filed a Rule 60(b) motion before the State Court seeking an indicative ruling.[4]

DLJ filed proof of claim No. 6-1 in Debtor's bankruptcy case on May 6, 2020 and a motion for relief from stay ("Stay Relief Motion")[5] on April 2, 2020. The Stay Relief Motion included a request for in rem relief under § 362(d)(4). Debtor filed an objection to DLJ's claim on November 15, 2020.[6] The Court held a joint final, evidentiary hearing on the Debtor's objection to DLJ's claim and on the Stay Relief Motion.

---

[4] *See* Motion for Extension of Time to Allow for State Court Hearing, filed June 16, 2022. Doc. 270.
[5] See Motion for Relief from the Automatic Stay and for the Abandonment of Property; Motion for In rem Relief Pursuant to 362(d)(4) by DLJ Mortgage Capital, Inc. – Doc. 27.
[6] Doc. 96.

-2-

On May 24, 2021, the Court entered an Order Granting In Rem Stay Relief under 11 U.S.C. § 362(d)(4) ("Stay Relief Order") in favor of DLJ with respect to the Property[7] and issued a supporting Memorandum Opinion.[8] Prior to the final hearing on the Stay Relief Motion, the Court previously had determined that the Foreclosure Judgment has preclusive effect and established DLJ's standing to file the Stay Relief Motion.[9] In granting DLJ *in rem* stay relief, the Court found that Debtor and Mrs. Jacobs' multiple prior bankruptcy filings[10] affected the Property and were "part of a scheme to delay, hinder, or defraud creditors" under § 362(d)(4).[11]

On May 24, 2021, the Court entered an order allowing DLJ's claim and overruling Debtor's objection to DLJ's claim (the "Order Allowing DLJ's Claim")[12] based in part on the Court's prior determination that the Foreclosure Judgment is entitled to preclusive effect.[13] The Court allowed DLJ's claim as a secured claim in the amount of $497,457.45, the amount claimed in DLJ's proof of claim No. 6-1.[14]

Debtor and DLJ participated in mediation in November of 2021.[15] The mediation did not result in settlement.[16] Debtor filed five motions seeking to alter or amend or for relief from the Court's Order Allowing DLJ's Claim and/or the Stay Relief Order and supporting Memorandum

---

[7] Doc. 160.

[8] Doc. 159

[9] *See* Memorandum Opinion (Doc. 117) and Order Granting Motion for Issue/Claim Preclusion (Doc. 118).

[10] *See* Memorandum Opinion (Doc. 159), identifying seven bankruptcy cases filed in New Mexico by either Debtor or Ruby Jacobs, including this bankruptcy case.

[11] Memorandum Opinion (Doc. 159).

[12] Doc. 161.

[13] *See* Memorandum Opinion (Doc. 159), p. 21.

[14] Doc. 161.

[15] *See* Doc. 212.

[16] *See* Doc. 222.

-3-

Opinion.[17] All of these efforts were unsuccessful.[18] The Court determined that it is bound by the Foreclosure Judgment and cannot look behind it.[19]

Debtor filed a Notice of Appeal[20] of the Court's Memorandum Opinion Regarding Debtor's Motion for Relief from a Judgment or Order[21] and a Notice of Appeal[22] of the Court's denial of Debtor's request for Rule 60(b) relief.[23] Both appeals remain pending with the Tenth Circuit Bankruptcy Appellate Panel.

Debtor has filed four plans over the course of this case: 1) Debtor's Reorganization Plan, dated June 21, 2021 (Doc. 168);[24] 2) Debtor's Reorganization Plan attached as Exhibit A to Disclosure Statement for Small Business Under chapter 11 filed September 30, 2021 (Doc. 206); 3) an Amended Proposed Plan of Reorganization attached as Exhibit A to Amended Disclosure Statement for Small Business under chapter 11 filed March 5, 2022 (Doc. 227); and 4) Second Amended Reorganization chapter 11 Plan dated July 11, 2022 (the "Second Amended Plan" - Doc. 284). The UST filed the Motion to Convert or Dismiss shortly after Debtor filed the Amended Proposed Plan of Reorganization. Following the preliminary hearing on the UST's Motion to Convert or Dismiss, the Court fixed a deadline of June 20, 2022 for Debtor to file the Second Amended Plan.[25] On Debtor's request, the Court extended that deadline to July 11, 2022.[26] Debtor timely filed the Second Amended Plan. The Amended Chapter 11 Small Business

---

[17] *See* Doc. 163, Doc. 172, Doc.176, Doc. 197, and Doc. 262.
[18] *See* Doc. 173, Doc. 228, Doc. 229, Doc. 257, and Doc. 277.
[19] *See* Doc. 277, p. 9
[20] Doc. 240.
[21] Doc. 228.
[22] Doc. 258.
[23] Doc. 257.
[24] Because Debtor filed this plan on his own while he was still represented by counsel, the Court determined it would take no further action with respect to that plan and invited Debtor to re-file a plan, *pro se*, following Debtor's termination of his bankruptcy counsel. *See* Doc. 184.
[25] *See* Doc. 260.
[26] *See* Doc. 270 and Doc. 278.

Disclosure Statement (Doc. 283) filed in conjunction with the Second Amended Plan has not yet been approved, and no confirmation hearing has yet been set on the Second Amended Plan. The Court deferred setting a hearing on approval of the disclosure statement pending a ruling on the UST's Motion to Convert or Dismiss.

A significant portion of the UST's Motion to Convert or Dismiss is based on its assertion that Debtor did not file this bankruptcy case in good faith. After the UST filed the Motion to Convert or Dismiss, the Court fixed an optional briefing deadline regarding the effect of § 1123(b)(5) on the confirmability of Debtor's plan in relation to Debtor's treatment of DLJ's claim.[27] The UST and Debtor each filed a brief on that issue.[28] Much of the UST's brief nevertheless addressed good faith considerations.

At the final hearing on the Motion to Convert or Dismiss, the UST put on evidence about Debtor and Mrs. Jacobs' prior bankruptcy filings. Debtor and Mrs. Jacobs put on substantial evidence regarding each of their prior bankruptcy filings, including the reasons each case was filed, the circumstances surrounding each filing, and why several of those cases resulted in dismissal. Debtor and Mrs. Jacobs also presented extensive character evidence in the form of testimony from Dr. Robert Cloutier, and letters obtained in connection with a criminal action filed by the United States against Debtor, Ruby Jacobs, and others in the United States District Court, Southern District of New York.

To decide the Motion to Convert or Dismiss, the Court need not consider evidence of Debtor's good faith or bad faith in filing and prosecuting this bankruptcy case and prior bankruptcy cases because, as explained below, cause to dismiss or convert exists based on the

---

[27] *See* Doc. 260
[28] *See* Doc. 282 and Doc. 283.

-5-

Code's requirement under § 1123(b)(5) that a plan may not modify the rights of a holder of a claim secured only by the debtor's principal residence.

FACTS

A.  <u>DLJ's Claim, Prepetition Arrears, and Regular Monthly Mortgage Payment</u>

Debtor and Mrs. Jacobs executed a Mortgage dated November 9, 2005 (the "Mortgage") against Debtor's principal residence securing the indebtedness under an Adjustable Rate Note of the same date (the "Note"). DLJ holds an allowed secured claim in this bankruptcy case secured only by the Mortgage in the amount of $497,457.45 as of the petition date. This figure is based on the amount of the *in rem* Foreclosure Judgment entered against Debtor and Mrs. Jacobs on June 5, 2018 in the State Court Action, plus interest accrued to the petition date, and the preclusive effect of the Foreclosure Judgment. The Foreclosure Judgment includes interest accrued through May 6, 2016 and provides that interest accrues thereafter at the fixed rate of 3.5% per annum.[29] DLJ holds an allowed claim secured solely by Debtor's principal residence in the amount stated above.

The regular monthly mortgage payment as stated in an attachment to DLJ's proof of claim is $1,655.04 plus monthly escrow of $525.69.[30] The loan payment history attached to DLJ's proof of claim No. 6-1 begins as of March 31, 2011, and shows no payments received.[31]

*HAMP*

Debtor and Mrs. Jacobs entered into negotiations with EMC Mortgage Corp., a predecessor in interest to DLJ with respect to the Note and Mortgage, for a modification to the

---

[29] *See* Claim No. 6-1, p. 45; Exhibit UST-19.  The State Court found that the unpaid principal balance was $324,305.93, and entered judgment in the amount of $442,555.93 (including interest accrued through May 6, 2016, attorney's fees and other charges). *Id.* The Foreclosure Judgment provided that the "judgment bear[s] interest at the rate of 3.5000% per annum from May 7, 2016." *Id.*
[30] *Id.*
[31] *Id.* at pp. 5- 10.

-6-

loan under the Home Affordable Modification Program ("HAMP"). Under the proposed HAMP

loan modification, Debtor's mortgage payments on the Property would be approximately $1,500,

including taxes and insurance. Debtor and Mrs. Jacobs testified that Nationstar Mortgage, LLC

("Nationstar"), a successor in interest to EMC Mortgage Corp. with respect to the Note and

Mortgage, refused to honor the HAMP loan modification. No evidence of a fully executed

HAMP loan modification was presented to the Court.

### Escrow Payments

As a 100% disabled veteran, Debtor is currently exempt from paying property taxes on

the Property.[32] Debtor also pays his own property insurance for the Property.[33] The amount of

the Foreclosure Judgment includes $26,692.10 for "Escrow Advances [for property taxes and

insurance] through May 6, 2016."[34]

### Arrearage Amount

The Foreclosure Judgment contains a breakdown of the $442,555.93 judgment amount as

of May 6, 2016, comprised of principal, interest, escrow advances, pre-acceleration late charges,

property inspection fees, attorney's fees, and litigation costs,[35] but there is no evidence before the

Court of a finding by the State Court regarding the amount of arrearages owing under the Note

and Mortgage had the due date of the debt not been accelerated.[36]

---

[32] *See* Exhibit MJ-H – Certificate of Eligibility. The Certificate of Eligibility certifies that Debtor "acquired legal residence in the State of New Mexico on 9/8/2003" and that his address is 800 Calle Divina NE, Albuquerque, NM 87112.
[33] *See* Exhibit MJ- I – Policy Declaration from Liberty Mutual for a policy period of 7/24/2021 – 07/24/2022.
[34] Foreclosure Judgment, Exhibit UST-19, p. 44.
[35] *Id.*
[36] The Foreclosure Judgment incorporates by reference the State Court's Findings of Fact and Conclusions of Law filed in the State Court Action on July 13, 2017. The State Court's additional findings contain no findings regarding the amount of the arrearage. The Findings of Fact and Conclusions of Law incorporated into the Foreclosure Judgment by reference are not in evidence in the contested matter initiated by the filing of the Motion to Convert or Dismiss.

An attachment to DLJ's proof of claim reflects a total pre-petition arrearage of $239,195.44.[37] Debtor disputes whether DLJ properly credited the last payment he and Mrs. Jacobs made on the Note and Mortgage sometime in the fall of 2011.[38] Debtor could not recall the exact date when he and Mrs. Jacobs stopped making payments because house sitters destroyed certain papers and documentation, but he believes the last payment to Nationstar was in September of 2011. Debtor and Mrs. Jacobs maintain that they were current on the loan payments as of September of 2011. Debtor testified further that he and Mrs. Jacobs later attempted to make some mortgage payments that were returned. Debtor and Mrs. Jacobs have made no post-petition mortgage payments to DLJ.

For purposes of ruling on the Motion to Convert or Dismiss, the Court will construe the evidence in favor of Debtor and Mrs. Jacobs and assume that Debtor and Mrs. Jacobs were current on the loan payments as of October of 2011, that the monthly mortgage payment is $1,500 (the amount they testified was the negotiated monthly mortgage payment under the HAMP loan modification), that they have not made any payments on the Note and Mortgage since November of 2011, and that the prepetition arrearages are $142,500.[39] In addition, $52,500 in unpaid post-petition mortgage payments will have accrued post-petition by the effective date

---

[37] *Id.*

[38] Exhibit  RJ-P shows a payment of $2,241.71 made by Western Union Speedpay on 9/23/2011.

[39] $1,500 x 95 months = $142,500 (one month in 2011; all of 2012, 2013, 2014, 2015, 2016, 2017, and 2018; plus 10 months of 2019). If the monthly mortgage payment is the base mortgage payment of $1,655.04 as stated in DLJ's proof of claim (without the escrow component of taxes and insurance), the pre-petition arrearage is at least $157,228.80 ($1,655.04 x 95 months = 157,228.80). If the monthly mortgage payment includes the escrow component, the pre-petition arrearage is at least $207,169.35 ($1,655.04 + $525.69 = $2,180.73 x 95 months = $207,169.35).

of a confirmed plan in this case (which assumes a plan will be confirmed by the end of November 2022) resulting in a total preconfirmation arrearage in the amount of $195,000.[40]

B. Treatment of DLJ's Claim in Debtor's Second Amended Plan

Debtor classifies DLJ's claim in the Second Amended Plan as "Unimpaired."[41]

The Second Amended Plan proposes treatment of DLJ's claim as follows:

> Debtor offers as indubitable equivalent cash payments and a Promissory Note secured by real property totaling $519,044.75. Debtor shall pay $22,044.75 as an initial payment and monthly mortgage payments of $1,469.65 along with minimum monthly Promissory Note payments of $414.75 (toward arrearages), totaling $1,887.40. This offer stands until if and/or when outstanding adjudication is concluded and may require reexamination by the Court.[42]

Debtor also asserts in the Second Amended Plan that he will be eligible for a Veteran's Loan "after the customary waiting period."[43] The evidence does not establish when the customary waiting period will end or the likelihood of Debtor obtaining such a loan. The Second Amended Plan contemplates that the result of Debtor's appeal of the Foreclosure Judgment and his appeal of this Court's Memorandum Opinion and Orders might require further amendment.[44] The Second Amended Plan asserts that the value of the Property is $576,000. The disclosure statement accompanying the Second Amended Plan states that the pre-petition arrearage on DLJ's secured claim is $239,195.44.[45] This amount matches the pre-petition arrearage reported in DLJ's proof of claim.[46]

---

[40] The exact amount of the preconfirmation arrearage is not material to the Court's decision. The Court's decision would not change, for example, if the preconfirmation arrearage actually is $175,000 or $250,000.
[41] Second Amended Plan, ¶ 4.01.
[42] *Id.*
[43] *Id.*
[44] Second Amended Plan, p. 2.
[45] *See* Doc. 283.
[46] *See* Claim 6-1; Exhibit UST-19.

-9-

C. Debtor's Income Sources

*Monthly Operating Reports and Bankruptcy Schedules*

Debtor's monthly operating reports ("MORs") reflect average total monthly income of approximately $5,000.[47] After subtracting Debtor's monthly expenses as reported in Debtor's MORs, Debtor's cumulative total net income from December of 2021 through August of 2022 is negative.[48]

Debtor's Schedule I[49] reflects total monthly income of $4,833.20, including a contribution from Mrs. Jacobs, Debtor's non-filing spouse, in the amount of $763.20, pension or

---

[47]

| MOR Reporting Month | Total Monthly Income | Living Expenses | Total Expenses/Disbursements | Net |
|---|---|---|---|---|
| August 2022 (Doc. 313) | $5,074.00 | $2,271.00 | $10,511.00 | ($5,437.00) |
| July 2022 (Doc. 311) | $4,206.00 | $1,467.00 | $8,390.00 | ($4,185.00) |
| June 2022 – None filed (Doc. 298 filed 7/28/22 is a duplicate of the May 2022 MOR filed as Doc. 274) | | | | |
| May 2022 (Doc. 274) UST Exhibit 13 | $4,465.00 | $1,174.00 | $3,362.00 | $1,103.00 |
| April 2022 (Doc. 265) UST Exhibit 13 | $3,526.00 | $1,965.00 | $3,004.00 | $522.00 |
| March 2022 (Doc. 254) UST Exhibit 13 | $6,059.00 | $2,639.00 | $5,155.00 | $904.00 |
| February 2022 (Doc. 239) UST Exhibit 13 | $5,109.00 | $2,800.00 | $3,832.00 | $1,277.00 |
| January 2022 (Doc. 226) UST Exhibit 13 | $4,609.00 | $4,049.00 | $5,404.00 | ($795.00) |
| December 2021 (Doc. 225) UST Exhibit 13 | $8,415.00 | $2,563.00 | $5,237.00 | $3,178.00 |

[48] *Id.*
[49] Doc. 1.

retirement income of $3,227.00, and social security income of $843.00.[50] Schedule J reflects a monthly mortgage expense of $1,500.00, and total net monthly income of $396.20. [51]

*Oregon Property*

Debtor owns real property in Oregon located at 6333 SW Buckskin Lane, Terrebonne, OR 97760 (the "Oregon Property"). Debtor scheduled the Oregon Property with a value of $150,000.[52] Debtor's Second Amended Plan values the Oregon Property at $483,400.[53] The Oregon Property is unencumbered. Debtor anticipates receiving rental income of between $1,600 and $2,200 per month for the Oregon Property.

*Storage Units*

Debtor currently rents several storage units where he has been storing some of his personal property. The monthly storage expense reflected in Debtor's Schedule J is $650.00. Debtor intends to clear out some of those units, which he anticipates will free up an additional $400.00 per month available to make plan payments.

*Photography Business*

Debtor is an accomplished photographer. In the past he has photographed several Presidents of the United States, presidential candidates, and many celebrities.[54] In 2021, Debtor served as Staff Photographer for Albuquerque, The Magazine.[55] Debtor hopes to revitalize his photography business as a source to fund his chapter 11 plan. He is actively seeking to sell his

---

[50] Doc. 1 at p. 35.
[51] Doc. 1 at pp. 36 – 37.
[52] *See* Doc. 1
[53] Second Amended Plan, Exhibit B.
[54] *See, e.g.,* MJ-P – Photography Gallery Article; RJ-GG – photo of Debtor (wearing a camera) with President Clinton.
[55] Exhibit MJ-O – Albuquerque, The Magazine, staff page.

-11-

photographs and secure assignment work. Debtor presented no documentary evidence to support any amount of anticipated revenues from his photography business and related projects.

*Litigation*

The Second Amended Plan identifies several litigation matters as a possible source of funding for the plan: 1) Adversary Proceeding No. 20-1053-j filed September 15, 2020 against DLJ's servicer, Selene Finance LP; 2) a copyright infringement action filed by Debtor against Journal Publishing Company, et al., Case No. 21-cv-00690-MF-SCY filed in the United States District Court for the District of New Mexico on July 21, 2021; and 3) a counter-claim filed by Debtor against United Van Lines for theft of property as Case No. 20-cv-03741 filed in the United States District Court for the Central District of California on April 23, 2020. Other than the statements for potential recoveries from these lawsuits as stated in the Second Amended Plan, no evidence was presented to the Court to support the likelihood of success of any of the lawsuits, any likely recovery amounts, or the anticipated time frame for recovery.

DISCUSSION

A.      "Cause" under § 1112(b)

The UST seeks conversion of this chapter 11 case to a case under chapter 7 or, in the alternative, dismissal for "cause" under § 1112(b) on two grounds: (a) Debtor's failure to file an acceptable plan within a reasonable time after the commencement of this chapter 11 case more than 28 months ago (as of the time the Motion to Convert or Dismiss was filed), and (b) that Debtor filed this chapter 11 case in bad faith after he or his non-filing spouse had filed seven prior bankruptcy cases in New Mexico in the past eleven years.

Section 1112(b) governs dismissal and conversion of chapter 11 cases and provides a non-exhaustive list of grounds that constitute "cause" for dismissal or conversion. *Frieouf v.*

*United States (In re Frieouf)*, 938 F.2d 1099, 1102 (10th Cir. 1991); *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) ("This list is not exhaustive." (citing the legislative history)); *In re Autterson*, 547 B.R. 372, 409 (Bankr. D. Colo. 2016) ("Section 1112(b)(4) identifies 16 examples of cause; but the list is illustrative, not exhaustive." (citations omitted)). Though not specifically enumerated in the statute, "cause" for dismissal or conversion includes a debtor's bad faith in filing or prosecuting a chapter 11 case, *In re S-Tek 1, LLC*, No. 20-12241-j11, 2021 WL 4006019, at * 7 (Bankr. D.N.M. Sept. 2, 2021) ("'[C]ause' under § 1112(b) can be based on a debtor's lack of good faith in filing a chapter 11 case."), and the failure to file a confirmable plan within a reasonable time. *See Hall v. Vance*, 887 F.2d at 1044 ("[T]he bankruptcy court may dismiss or convert a chapter 11 case if the debtor is unable to effectuate a plan, which means that the debtor lacks the ability to formulate a plan or to carry one out." (citations omitted)); *In re Vincens*, 287 F. App'x 686, 688 (10th Cir. 2008) ("Dismissal . . . is appropriate where the debtor's failure to file an acceptable plan after a reasonable time indicates its inability to do so whether the reason for the debtor's inability to file is its poor financial condition, the structure of the claims against it, or some other reason." (quoting *SBA v. Preferred Door Co., Inc. (In re Preferred Door Co., Inc.)*, 990 F.2d 547, 549 (10th Cir. 1993))); [56] *In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994) ("[D]ismissal is proper 'if the court determines that it is unreasonable to expect a plan can be confirmed in the [C]hapter 11 case.'" (quoting 5 Collier on Bankruptcy ¶ 1112.03[2][d][ii] (15th ed. 1993)).

The party requesting dismissal or conversion bears the burden of demonstrating "cause" by a preponderance of the evidence. *In re Sunnyland Farms, Inc.*, 517 B.R. 263, 266 (Bankr.

---

[56] As explained by the Tenth Circuit Bankruptcy Appellate Panel, by the 2005 amendment to § 1112(b), "inability to effectuate a plan" was one of the enumerated grounds for "cause." *In re Hook*, 397 B.R. 544, n. 13 (10th Cir. BAP 2008) (Table).

-13-

D.N.M. 2014) ("The party requesting dismissal or conversion under § 1112(b) bears the burden of establishing cause by a preponderance of the evidence." (citation omitted)). Although "cause" is "'a flexible' concept," *Autterson,* 547 B.R. at 409 (quoting *In re Pac. Rim Invs., LLP,* 243 B.R. 768, 772 (D. Colo. 2000)), once "cause" is demonstrated, the Court must dismiss or convert the case to chapter 7, or appoint a chapter 11 trustee or examiner, "whichever is in the best interest of creditors and the estate," unless the Court "finds and specifically identifies unusual circumstances" that establish that conversion or dismissal "is not in the best interests of creditors and the estate." § 1112(b)(2); *see also In re Picacho Hills Utility Co., Inc.*, 518 B.R. 75, 81 (Bankr. D.N.M. 2014) (same); *Sunnyland Farms*, 517 B.R. at 266 ("The Court is generally required to dismiss or convert a case under § 1112(b) upon a finding of 'cause'."). Debtor bears the burden of establishing "unusual circumstances." *In re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012) ("[O]nce cause is demonstrated, the burden shifts to the opposing party to prove 'unusual circumstances.'"); *In re RGB, LLC*, No. 18-11140-t11, 2019 WL 177908, at *3 (Bankr. D.N.M. Jan. 11, 2019) (same). In addition, to avoid dismissal or conversion upon a showing of "cause," the debtor or other interested party must establish that there is "a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time." § 1112(b)(2)(A).

For the reasons stated below, "cause" exists to dismiss or convert this case based on Debtor's inability to effectuate a plan that complies with the anti-modification prohibition in § 1123(b)(5) and the requirements of § 1124 to cure DLJ's arrearage and render its claim "unimpaired." Debtor has not rebutted the showing of "cause" because he has failed to establish that there is a reasonable likelihood that he will confirm a plan within a reasonable period of time. Because the UST has established cause to dismiss or convert this case based on Debtor's

inability to effectuate a plan, it is unnecessary for the Court to address the UST's alternate bad faith filing ground for dismissal.

B.      Summary of the§ 1123(b)(5) issue

Debtor's ability to effectuate the Second Amended Plan depends in part on whether Debtor's proposed treatment in the plan of DLJ's claim secured only by Debtor's principal residence violates the anti-modification prohibition in § 1123(b)(5). Under that section, unless the affected creditor consents,[57] a plan may not "modify" the rights of a holder of a claim secured only by the debtor's principal residence. Debtor's Second Amended Plan proposes to deaccelerate the maturity of the loan and cure preconfirmation arrearages by paying DLJ as follows: a) $22,044.75 as an initial payment; b) monthly mortgage payments of $1,469.65 for mortgage payments due post-confirmation; and c) minimum monthly payments of $417.75 to be applied to the preconfirmation arrearages.[58] Together, the proposed monthly payments to DLJ under the Second Amended Plan total $1,887.40.[59] The Second Amended Plan states that DLJ's claim is "Unimpaired."[60]

Whether § 1123(b)(5)'s anti-modification provision requires a chapter 11 debtor to pay all preconfirmation arrearages on a claim secured only by the debtor's principal residence in full by the plan effective date or permits a cure of arrearages in installments after plan confirmation depends on whether the claim is deemed unimpaired under § 1124(2) if installment payments are to be made. For the reasons explained below, this Court holds that § 1123(b)(5), when read in conjunction with § 1124(2), requires a chapter 11 debtor to pay all preconfirmation arrearages on

---

[57] No evidence was presented that DLJ will consent to the Second Amended Plan. DLJ and Debtor are quite adverse to each other. Their mediation effort failed. The Court infers that DLJ does not consent to the Second Amended Plan.
[58] Second Amended Plan, ¶ 4.01.
[59] Id.
[60] Second Amended Plan, ¶ 4.01.

a claim secured only by the debtor's principal residence in full, and satisfy §1124(2)'s other requirements to unimpair a claim, by the plan effective date.[61] Because Debtor's Second Amended Plan does not provide for payment of all arrearages due DLJ by the plan effective date, Debtor's proposed treatment of DLJ's claim violates § 1123(b)(5)'s anti-modification prohibition and the plan cannot be confirmed.

      C.     The Second Amended Plan violates the
                anti-modification prohibition in § 1123(b)(5)

The Court will begin its analysis of § 1123(b)(5) by reviewing legislative history and providing an overview of §§ 1123(b)(5) and 1124(2) and comparing those sections with §§ 1322(b)(2) and (5) as applied to a home mortgage in chapter 13. The Court will then provide its rationale for its conclusion that § 1123(b)(5), when read in conjunction with §1124(2), requires a chapter 11 debtor to pay all preconfirmation arrearages on a claim secured only by the debtor's principal residence in full by the plan effective date. Finally, the Court will explain why it is not persuaded by the rationale of courts that reach a contrary result.

      1.    Legislative history and overview of sections 1123(b)(5) and 1124(2) and
          how they compare with sections 1322(b)(2) and (5) as applied to home mortgages

The Code was amended in 1994 to add § 1123(b)(5) to chapter 11. Section 1123(b)(5), which tracks the chapter 13 language of § 1322(b)(2), provides, with exceptions not applicable here, that a plan may,

> modify the rights of holders of secured claims, other than a claim secured only by
> a security interest in real property that is the debtor's principal residence, or of

---

[61] After reexamining the issue, the Court is following its opinion *In re Cottonwood Corners Phase V, LLC,* No. 11-11-12663 JA, 2012 WL 566426, at \*13 (Bankr. D.N.M. Feb. 17, 2012). That case involved a claim in default secured by a commercial property and considered whether the chapter 11 plan's proposed treatment of that claim rendered the claim unimpaired under § 1124(2). If the claim was unimpaired, the holder of the secured claim would be conclusively presumed to have accepted the chapter 11 plan under § 1126(f). This Court held that for the claim (which was in its own class) to be unimpaired, § 1124(2)(A) requires a cure of preconfirmation arrearages by payment in full by the plan effective date.

holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

The legislative history for the 1994 Amendment that added § 1123(b)(5) to the Code states:

This amendment conforms the treatment of residential mortgages in chapter 11 to that in chapter 13, preventing the modification of the rights of a holder of a claim secured only by a security interest in the debtor's principal residence.

H.R. Rep. No. 103-835 at 46 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3340, 3354. Although the language in the legislative history is generalized, the target of the amendment was to conform treatment of residential mortgages in chapter 11 to that in chapter 13 with respect to the bifurcation of home mortgage loans under § 506. Prior to the enactment of § 1123(b)(5), a chapter 11 debtor could bifurcate a loan secured only by the debtor's principal residence and restructure payments on the secured claim stripped-down to the value of the property. *Wade v. Bradford*, 39 F.3d 1126, 1127 (10th Cir. 1994). In contrast, chapter 13 debtors could not bifurcate a loan secured only by the debtor's principal residence. *Nobelman v. Am. Sav. Bank.*, 508 U.S. 324, 332 (1993). After the enactment of § 1123(b)(5), which prevents the modification of the rights of a holder of a claim secured only by a debtor's principal residence, like in chapter 13, bifurcation no longer is possible in chapter 11 cases (without the consent of the affected creditor). *Wissel v. Deutsche Bank Nat'l Trust Co., (In re Wissel)*, 619 B.R. 299, 314 (Bankr. D.N.J. 2020).

However, the enactment of § 1123(b)(5) did not entirely conform the treatment of residential mortgages in chapter 11 to that in chapter 13. The Code as enacted in 1978 contained both §§ 1322(b)(2) and (5). Although § 1322(b)(2) is identical to the later enacted § 1123(b)(5), Congress did not enact § 1322(b)(2)'s companion provision–§ 1322(b)(5)–as part of chapter 11. Section 1322(b)(5), when read together with §§ 1322(d) and (e) and 1325(a)(5)(B)(iii), contains an exception to § 1322(b)(2)'s proscription on modifying the rights of a holder of a claim

-17-

secured only by the debtor's principal residence. Those Code sections permit a chapter 13 debtor to cure prepetition arrearages (as "determined in accordance with the underlying agreement and applicable nonbankruptcy law" § 1322(e)) on a mortgage secured only by the debtor's personal residence in equal monthly amounts (§ 1322(a)(5)(B)(iii)) over a period not to exceed five years (§ 1322(d)) notwithstanding § 1322(b)(2)'s anti-modification prohibition. A chapter 13 debtor must also maintain all post-petition payments on the home mortgage while the chapter 13 case is pending and after the case is closed in accordance with the terms of the mortgage as if no default had occurred. *See* §§ 1322(b)(5) and 1325(a)(5)(B)(I)(aa). If the home mortgage loan matures before the last chapter 13 plan payment is due, the chapter 13 plan nevertheless may provide for payment of the claim under the plan as modified pursuant to § 1322(b)(5). *See* § 1322(c)(2).[62]

Unlike chapter 13, chapter 11 does not include any requirement, with respect to a claim secured only by the debtor's principal residence, to maintain payments on the mortgage while the chapter 11 case is pending or to pay arrearages in equal monthly installments pursuant to a plan.[63] Nor does chapter 11 require that arrearages on the claim must be paid over a period not to exceed five years after plan confirmation.[64]

Section 1124(2) was enacted as part of the Bankruptcy Reform Act of 1978, long before the 1994 Amendment to the Code that adopted the anti-modification prohibition in § 1123(b)(5). Consequently, when the impairment provisions of § 1124(2) were adopted, they were not

---

[62] Section 1322(c) was added as part of the 1994 Amendment to the Code that added § 1123(b)(5)'s anti-modification prohibition in chapter 11 cases. A similar exception for chapter 11 cases was not added as part of the 1994 Amendment to the Code.

[63] There is no chapter 11 counterpart to § 1322(b)(5) or § 1325(a)(5)(B)(iii) which require the maintenance of mortgage payments while the case is pending and require plan payments be made in equal monthly amounts, unless the creditor consents to other treatment.

[64] Chapter 11 contains no statutory limit on the length of plan, although for cases governed by Subchapter V of chapter 11 the Code requires that certain payments be made under the plan over a three-to-five-year period. *See* § 1191(c)(2) applicable in Subchapter V cases. However, Subchapter V does not require that mortgage arrears be cured within the three-to-five-year period.

-18-

intended to be read in conjunction with the later enacted § 1123(b)(5). Rather, application of § 1124(2) only determined whether a creditor is entitled to vote to accept or reject a chapter plan and whether the plan proponent must satisfy the confirmation requirements of § 1129(a)(7) and § 1129(a)(8) (which apply only to impaired classes of claims and interests). If a class of claims is deemed unimpaired by § 1124(2), then, under §1126(f), the holders of claims in the class are conclusively presumed to have accepted the plan, and each holder of a claim in that class is not entitled to the "fair and equitable" protections of § 1129(b).[65]

2. Section 1123(b)(5), when read together with section 1124, requires
   payment of home mortgage arrearages in full by the plan effective date

Section 1123(b)(5)'s anti-modification prohibition must be read together with § 1124 to determine whether a chapter 11 plan impermissibly modifies the rights of a holder of a claim secured only by the debtor's principal residence. Reading those provisions together, the plan does not "modify" the rights of the holder of the claim only if the claim is "unimpaired" as set forth in § 1124. A claim secured only by the debtor's principal residence is unimpaired, and therefore does not modify the rights of the holder of the claim, only if all preconfirmation loan arrearages are paid in full by the plan effective date. These conclusions flow from the meaning of the term "rights" under § 1123(b)(5), the concepts of "modifying" rights, "unimpairment," and "curing" a default under chapter 11, and differences between chapter 11 and chapter 13.

Section 1123(b)(5), which was added to the Code in 1994, provides that a chapter 11 plan may not "modify the rights of holders of secured claims" that are secured only by the debtor's principal residence. Section 1123(b)(5) provides further that, as an alternative to "modifying" the rights of a holder of the claim, the plan may "leave [those] rights *unaffected*" (emphasis added).

---

[65] Section 1129(b) requires that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

Under *Nobelman*, 508 U.S. at 329-30, the "rights" of the home mortgage lender referenced in § 1123(b)(5) refer to the state law contractual rights of the holder of the claim as reflected in the relevant mortgage instruments.[66] Such contractual rights

> include the right to repayment of the principal in monthly installments over a fixed term at specified . . . rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure.

*Id.* at 329. Unless those contractual rights of a holder of a claim secured only by the debtor's principal residence are left unaffected by the plan, the plan violates the anti-modification prohibition in § 1123(b)(5).

Chapter 13 contains exceptions to its anti-modification prohibition not found in chapter 11. Section 1322(b)(5) provides that "notwithstanding" § 1322(b)(2), a prepetition default may be cured under a plan within a reasonable time so long as post-petition mortgage payments remain current while the chapter 13 case is pending, if the last payment on the mortgage is due after the last chapter 13 plan payment is due.[67] This provision in combination with § 1322(d) permits payment of prepetition home mortgage arrearages in installments over a period not to exceed five years[68] as a permissible modification of the contractual rights of the holder of the claim. Until the cure of arrearages is completed, the plan modifies the lender's contractual right to payment of the arrearage amount. Likewise, § 1322(c), another companion provision to § 1322(b)(2) with no chapter 11 counterpart, provides for a permissible modification of a claim secured only by the debtor's principal residence by authorizing a plan, "notwithstanding"

---

[66] *Nobelman* construed chapter 13's anti-modification provision in § 1322(b)(2), which is identical to § 1123(b)(5), and held that the "rights" of the home mortgage lender referenced in § 1322(b)(2) refer to the state law contractual rights as reflected in the relevant mortgage instruments. *Nobelman*, 508 U.S. at 329-30. *Nobelman* noted that the term "rights" is not defined in the Code. *Id*.

[67] Section 1322(b)(2) and § 1322(b)(5) were both part of the Bankruptcy Reform Act of 1978.

[68] Section 1322(d) provides of a maximum 5-year plan term.

§ 1322(b)(2), among other things, to "provide for the payment of the claim *as modified* pursuant to section 1325(a)(5)" where the home mortgage loan matures before the last chapter 13 plan payment is due. § 1322(c)(2) (emphasis added). In other words, to determine whether a chapter 13 plan permissibly (or impermissibly) modifies the contractual rights of a holder of a claim secured only by the debtor's principal residence, § 1322(b)(2) must be read together with §§ 1322(b)(5) and 1322(c), which provide codified exceptions to § 1322(b)(2)'s anti-modification prohibition.

When Congress added § 1123(b)(5) to chapter 11 in 1994, it did not add any chapter 11 counterparts to the chapter 13 exceptions to the anti-modification prohibition in § 1322(b)(2).[69] The Court cannot simply import language from chapter 13 into chapter 11 to create exceptions to § 1123(b)(5)'s anti-modification prohibition.[70] Instead, to determine whether a chapter 11 plan permissibly (or impermissibly) modifies the contractual rights of a holder of a claim secured only by the debtor's principal residence, the Court must look to § 1124, which governs when a claim is "impaired."[71]

In *Lennington*, the bankruptcy court held that whether a claim is unimpaired under § 1124(2) determines whether a chapter 11 plan's treatment of a claim secured only by the

---

[69] In *Haake,* the bankruptcy court held that because, unlike under chapter 13, there is no chapter 11 statutory exception "which would permit a chapter 11 plan to modify claims secured by the debtor's principal residence, even if those obligations matured prior to the petition date and might be subject to modification in chapter 13," such modification of claims is not permitted under chapter 11. *In re Haake*, 483 B.R. 524, 534 (Bankr. W.D. Wis. 2012).

[70] *Haake*, 483 B.R. at 534 ("The Court cannot simply import the language of § 1322(c)(2) into § 1123(b)(5)."); *see also In re Brock*, 628 B.R. 509, 511 (Bankr. N.D. Miss. 2021) (collecting cases).

[71] Section 1190, applicable only in Subchapter V cases, provides a chapter 11 exception to § 1123(b)(5)'s anti-modification prohibition. Subchapter V does not apply to Debtor's chapter 11 case. Section 1190 provides that § 1123(b)(5) does not apply to the rights of the holder of a claim secured only by the debtor's principal residence if the new value received in connection with the granting of the lien was "(A) not used primarily to acquire the real property; and (B) used primarily in connection with the small business of the debtor."

-21-

debtor's principal residence complies with the Code. *In re Lennington*, 288 B.R. 802, 804 (Bankr. C.D. Ill. 2003). The *Lennington* court explained that the chapter 11 counterpart to a chapter 13 debtor's right under § 1322(b)(5) to reinstate an accelerated debt is found not in § 1123, but in § 1124(2). *Id*.

This Court agrees with *Lennington* insofar as it looks to § 1124(2) to determine whether a chapter 11 plan impermissibly modifies a claim secured only by the debtor's principal residence in violation of § 1123(b)(5)'s anti-modification provision. The Court disagrees with *Lennington* with respect to what § 1124(2) requires so as not to impermissibly modify a claim secured only by the debtor's principal residence contrary to § 1123(b)(5)'s anti-modification provision. For that reason, the Court also disagrees with the holding in *Lennington* allowing a chapter 11 debtor to cure home mortgage arrearages in installments post-confirmation.

Section § 1124(1) provides that a claim or interest is impaired unless it "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." If a plan leaves unaltered the contractual rights of the home mortgage lender, those rights are left "unaffected." Consequently, the claim is "unimpaired" under § 1124, and the chapter 11 plan does not "modify" the secured creditor's rights contrary to § 1123(b)(5)'s anti-modification prohibition.

Alternatively, under § 1124(2), a debtor may "unimpair" an otherwise impaired claim so that the plan leaves the rights of the holder of the claim "unaffected." Once the claim is rendered "unimpaired," the plan does not "modify" the rights of the home lender in violation of § 1123(b)(5). Section 1124(2) provides that notwithstanding the acceleration of the maturity date of a claim after default, a claim is deemed unimpaired if the plan,

> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section

-22-

365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

The legislative history of § 1124(2) provides some insight into its meaning:

> A claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default. The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. *The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain*. Curing of the default and the assumption of the debt in accordance with its terms is an important reorganization technique for dealing with a particular class of claims, especially secured claims.

S. Rep. No. 95-989 at 120 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5906

(emphasis added).

The terms "cure" and "modify" are not defined in the Code. In the context of chapter 13, several circuit courts have addressed the distinction between modifying creditor rights and curing a default. A modification of a loan is a "fundamental alteration in a debtor's obligations, e.g., lowering monthly payments, converting a variable interest rate to a fixed interest rate, or extending the repayment term of a note." *In re Litton,* 330 F.3d 636, 643 (4th Cir. 2003). By

-23-

contrast, "a 'cure' merely reinstates a debt to its pre-default position, or it returns the debtor and creditor to their respective positions before the default." *Id.* at 644. A cure will "remedy or rectify the default and restore matters to the *status quo ante*." *In re Clark,* 738 F.2d 869, 872 (7th Cir. 1984). "Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified." *Di Pierro v. Taddeo (In re Taddeo),* 685 F.2d 24, 26-27 (2nd Cir. 1982)*.*

Yet the concepts of modification and cure are not mutually exclusive. A plan can provide for the cure of defaults with or without modifying the rights of the holder of a claim. For example, if the cure of defaults requires payment of preconfirmation loan arrearages, and by the time the plan goes into effect those arrearages have been paid in full, the plan does not modify the lender's contractual rights to such payments. By contrast, if the cure of arrearages takes place over time after the plan goes into effect, the plan modifies the claim because it negates the claimholder's contractual right to immediate payment of the full arrearage amount following acceleration of the loan after default. Under this scenario, the "cure" will not be completed until payment of all arrearages in full under the plan, and the creditor's rights are modified pending completion of the cure.

Section 1124(2) fleshes out what is required to effectuate a cure under chapter 11 that does not modify the contractual rights of the holder of a claim. To unimpair a claim, § 1124(2) requires a "cure" of all defaults, reinstatement of the original maturity of the loan, and compensation for any losses caused by the default, all without otherwise altering the legal, equitable, or contractual rights of the holder of the claim. Until the cure is completed and the other requirements of § 1124(2) are satisfied, the creditor's contractual rights are modified. It is only upon completion of the cure and compensation of the creditor for any losses caused by the

-24-

default that the default is nullified and the parties are restored to their original bargain under the pre-default status of the loan. Unless this occurs by the time the plan goes into effect, including payment in full of any preconfirmation loan arrearages, the plan modifies the contractual rights of the creditor under the loan documents to be paid immediately and in full after acceleration of the loan.

The conclusion that preconfirmation arrearages must be paid in full by the plan effective date to effectuate a cure under § 1124(2) for the claim to be unimpaired is underscored by 1) there otherwise being no deadline to complete the cure prior to the reinstated maturity date of the loan and 2) the absence of chapter 11 creditor protections that are not needed only because the default must be cured in full by the plan effective date.

Section 1124(2)(B) requires reinstatement of the maturity of the loan in order to deem the claim unimpaired, which means the entire claim must be paid in full prior to the maturity date.[72] In the case of a home mortgage, the loan maturity date could be as long as twenty-five years or more after confirmation of a plan. Section 1124(2)(B) imposes no other deadline to cure arrearages if the cure may be made in installments. The fair and equitable requirement of § 1129(b), which ordinarily imposes a limit on how long a chapter 11 debtor can stretch out a payment obligation,[73] does not apply to limit the term of repayment of a claim deemed

---

[72] A chapter 11 plan providing for payments on a loan secured only by the debtor's principal residence beyond the loan maturity date would violate the anti-modification prohibition in § 1123(b)(5). *See Brock*, 628 B.R. at 511 (holding that proposed chapter 11 plan that would extend the terms of a loan beyond the original maturity date is a modification rather than a cure and is thus barred by § 1123(b)(5)); *In re Sampson*, No. 3:18-BK-104-JAF, 2018 WL 4786404, at *2 (Bankr. M.D. Fla. Sept. 6, 2018) (same); *In re Crump*, 529 B.R. 106, 111-12 (Bankr. D.S.C. 2015) (same).

[73] The reasonableness of the term of payment of a loan under a chapter 11 plan is evaluated under § 1129(b)'s "fair and equitable requirement." *E.g., In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 37 (Bankr. D. Kan. 2001) ("[T]he reasonableness of the term of payment is appropriately evaluated under the 'fair and equitable' test . . . ."); *In re Hendrix-Barnhill Co.*, No. 11-01974-8-RDD, 2011 WL 5902740, at *2 (Bankr. E.D.N.C. Oct. 27, 2011) (evaluating the amortization period under the plan for the loan pursuant to the "fair and equitable" requirement of § 1129(b)); *In re Shoaf*, No. 11-04057-8-JRL, 2012 WL 1194114, at *2 (Bankr. E.D.N.C. Apr. 10, 2012) (same).

unimpaired under § 1124.[74] In addition, a creditor holding an unimpaired claim has no right to vote on the plan and is conclusively deemed to have accepted the plan (*see* § 1126(f)) and is not entitled to the "fair and equitable" protections of § 1129(b). Voting rights and § 1129(b) protections are not needed where the default must be cured in full by the plan effective date and the debtor thereafter is required to pay the claim in accordance with the underlying loan documents.

The prevailing view, developed mostly in the context of determining whether a commercial loan is deemed unimpaired under § 1124(2), is that § 1124(2)(A) requires the chapter 11 plan to provide for payment of pre-confirmation arrearages on the secured claim in full by the plan effective date to satisfy the cure requirement for the claim to be deemed unimpaired.[75] The Court in *Schatz* explained,

> In order to take advantage of § 1124(2) and unimpair an otherwise impaired class, the plan must "cure" any defaults that have occurred. 11 U.S.C. § 1124(2). By providing for a "cure" of all defaults, the plan places the impaired creditor back into its original position. It seems then that "cure" under § 1124(2) must occur, in full, prior to or on the effective date of the plan in order to restore the parties to their pre-default state.

*In re Schatz*, 426 B.R. 24, 27 (Bankr. D.N.H. 2009). This Court agrees. Consequently, if a "cure" under § 1124(2) requires payment of loan arrearages in full by the plan effective date, a chapter 11 plan impermissibly modifies the rights of an impaired claim secured only by the debtor's principal residence in violation of § 1123(b)(5)'s anti-modification

---

[74] Section 1129(b) does not apply to unimpaired classes of claims. *See* §§ 1126(f), 1129(a)(8) and 1129(b).

[75] *Cottonwood Corners*, 2012 WL 566426, at *13 (an opinion issued by this Court); *In re Schatz*, 426 B.R. 24, 27-28 (Bankr. D.N.H. 2009) (involving an individual debtor's mortgage loan); *In re Tri-Growth Ctr. City, Ltd*., 136 B.R. 848, 852 (Bankr. S.D. Cal. 1992); *In re Hall*, 117 B.R. 425, 429 (Bankr. S.D. Ind. 1990); *In re Kuljis Seafood Co.*, 73 B.R. 659, 661 n.1 (Bankr. S.D. Miss. 1986); *In re Jones*, 32 B.R. 951, 960 (Bankr. D. Utah 1983); *In re Otero Mills, Inc.*, 31 B.R. 185, 186 (Bankr. D.N.M. 1983); *but see In re Lennington*, 288 B.R. 802, 804-06 (Bankr. C.D. Ill. 2003) (§ 1124(2) permits a cure of home mortgage arrearages in installments).

Case 19-12591-j11    Doc 314    Filed 10/14/22    Entered 10/14/22 16:54:16 Page 26 of 36

prohibition unless all preconfirmation loan arrearages are paid in full by the plan effective date.[76]

Debtor's bankruptcy case in particular illustrates why the cure under § 1124(2) must occur in full by the effective date of the plan for the plan not to violate § 1122(b)(5)'s anti-modification prohibition. The Mortgage provides that to prevent foreclosure after default all arrearages under the Mortgage must be paid in full, at the latest, by entry of a foreclosure judgment.[77] Here, the Foreclosure Judgment was entered prepetition, on June 5, 2018, without any prior payment of arrearages. In fact, Debtor has made only a few, if any, mortgage payments on his home in the nine-year period before commencement of this chapter 11 case and has made no mortgage payments during the entire pendency of the bankruptcy case.

Construing the evidence in a light favorable to Debtor for purposes of its ruling on the Motion to Convert or Dismiss, the Court has assumed that the preconfirmation arrearages are $195,000 and that the monthly mortgage payment is $1,500.[78] The loan maturity date without acceleration is December 1, 2035.[79] If the cure of preconfirmation arrearages under § 1124(2) could be made over a period of years and still be consistent with the anti-modification prohibition in § 1123(b)(5), then Debtor could reinstate the December 1, 2035 maturity of the loan, make no post-petition mortgage payments by the effective date of his chapter 11 plan,[80] and, after the plan goes into effect, pay the pre-confirmation arrearages of $195,000 over an

---

[76] Section 1190, applicable only in Subchapter V chapter 11 cases, sets forth a limited exception to § 1123(b)(5)'s anti-modification prohibition. *See* the text accompanying footnote 71, *supra*.

[77] Mortgage, ¶ 19; Exhibit UST-19, p. 30.

[78] On the petition date, the principal balance of the loan was $324,305.93. *See* Foreclosure Judgment, Exhibit UST-19, p. 40.

[79] *See* Adjustable Rate Note, Exhibit UST-19, p. 11.

[80] Unlike § 1322(b)(5), § 1124(2)(A) does not require payments to be maintained post-petition until plan confirmation. Section 1124(A) permits a cure of "any default that occurred before or after commencement of the case."

approximate 13-year period ending on December 1, 2035.[81] It is counterintuitive to conclude that a plan that provides for payment over a period of thirteen years after the plan effective date of a significant arrearage that has accumulated over a period of more than ten years and is well over half of the original loan amount does not "modify" the contractual rights of a holder of the claim when the contract required payment of all arrearages in full prior to the entry of the Foreclosure Judgment, which occurred well before the date Debtor commenced his chapter 11 case.

Debtor's Second Amended Plan proposes to make an initial payment of $22,044.75 and then pay $417.75 per month to be applied to the preconfirmation arrearage. That is insufficient to cover interest only payments on a $172,955.25 arrearage (the assumed $195,000 preconfirmation arrearage less the $22,044.75 initial payment proposed under the plan) that accrues interest at the nondefault rate.[82] To complete the cure by the maturity of the loan, a balloon payment would be due December 1, 2035 in an amount close to the assumed $195,000 preconfirmation arrearage. It would take over thirty years to pay the principal amount of the arrearage at $417.75 per month after the initial $22,044.75 payment even without accrual of any interest on the arrearage. Even if the Second Amended Plan were to require a balloon payment on the maturity date of the loan, Debtor's proposed treatment of DLJ's claim impermissibly modifies DLJ's contract rights under the Mortgage.[83]

---

[81]  Compliance with § 1124(2) reinstates the maturity of the loan. *See* § 1124(2). If a cure may be made over a period of years post-confirmation, § 1124(2) does not otherwise limit the period of the cure.

[82] Interest only payments on $172,955.25 at 3.5% requires a monthly payment of $504.45.

[83] The borrower's reinstatement rights under the Mortgage terminated upon the entry of the Foreclosure Judgment. *See* Mortgage, ¶ 19 ("If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time by the earliest of:  . . . (c) entry of a judgment enforcing this Security Instrument."). Exhibit UST-19, p. 30.

3. <u>The reasoning of cases holding section 1123(b)(5) permits a plan to provide for a cure of arrearages in installments is not persuasive</u>

A few courts have held that a chapter 11 plan does not modify the rights of a holder of a claim secured by the debtor's principal residence in violation of § 1123(b)(5) if pre-confirmation arrearages are paid in installments after the plan is confirmed. *In re LaPorta*, 578 B.R. 792, 798-800 (Bankr. N.D. Ill. 2017); *In re Lennington*, 288 B.R. 802, 804-06 (Bankr. C.D. Ill. 2003*). LaPorta* and *Lennington* discuss the issue at some length. This Court will examine the reasoning of those cases. Neither case is persuasive on this issue.

In *Lennington*, the bankruptcy court concluded that § 1123(b)(5) permits a plan to provide for a cure of arrearages on a home mortgage loan in installments. The *Lennington* court first observed that "[c]ourts have long recognized the right of an individual Chapter 11 debtor to reinstate a residential mortgage and cure a prepetition arrearage in installment payments through their plan of reorganization," and concludes that "[§] 1123(b)(5) did not mark a sea change [because it] prohibits only 'modification' of a residential mortgage, making no reference to a debtor's right to cure." *Lennington*, 288 B.R. at 805. Then *Lennington* court then quotes with approval a case that states that "modification and cure are distinct, mutually exclusive topics" and that "cure deal[s] with past defaults, whereas the modifications permitted (or prohibited) by § 1322(b)(2) concern future obligations."[84] The import of that statement is that a cure of arrearages or other defaults, no matter how long it takes, never modifies the rights of a holder of a claim.

But as explained above, the concepts of modification and cure are not mutually exclusive. A plan can provide for the cure of defaults with or without modifying the contractual rights of the holder of a claim. It simply is not the case that the concepts of modification and cure are

---

[84] *Lennington*, 288 B.R. at 805 (quoting *In re Garcia*, 276 B.R. 627, 635 (Bankr. D. Ariz. 2002)).

mutually exclusive because cure deals only with past defaults whereas the modifications permitted (or prohibited) by §§ 1123(b)(5) and 1322(b)(2) concern only future obligations. A "cure" deals with past defaults, but if the cure is to be made in future installments, the "cure" restructures a past obligation to pay the arrearage amount by replacing the past obligation with a restructured obligation to pay the arrearages in the future. Sections 1123(b)(5) and 1322(b)(2), by prohibiting the plan from modifying the rights of the holder of a claim secured only by the debtor's principal residence, prohibit the replacement of any past obligation under the underlying loan documents (whether or not in default) with a restructured obligation to be performed in the future. Chapter 13, unlike chapter 11, contains statutory exceptions to its anti-modification prohibitions.

Second, the *Lennington* court observed that:

Section 1123(b)(5) was enacted to equalize the treatment of residential mortgages in Chapters 11 and 13, by preventing Chapter 11 debtors from "modifying" the mortgagee's rights by bifurcating an undersecured residential mortgage into a secured claim and an unsecured claim, thereby stripping down the mortgage to the value of the house.

288 B.R. at 806. This Court agrees with that statement of the law. But the *Lennington* court goes on to say that "[s]ection 1123(b)(5) was not intended to usurp the longstanding right of reinstatement in Chapter 11 which, consistent with that under Chapter 13, permitted the cure of a prepetition mortgage arrearage on an installment basis." *Id*. The legislative history of § 1123(b)(5) does not support that conclusion.[85]

Finally, the *Lennington* court states:

[T]his Court does not perceive any reason why Congress would want to deprive those few individual Chapter 11 debtors from saving their homes by curing a prepetition arrearage in installments, when the same thing happens in the majority of the multitude of Chapter 13 filings. Prohibiting a debtor proceeding under Chapter 11 from curing a prepetition mortgage default in installment payments,

---

[85] *See* discussion at page 17, *supra*.

while a similarly situated debtor proceeding under Chapter 13 is permitted to do so, would be contrary to the intent of Congress to conform the treatment of residential mortgages under Chapter 11 to that under Chapter 13.

*Lennington*, 288 B.R. at 806. However, the legislative history does not specifically address conforming chapter 11 to chapter 13 with respect to payment of mortgage arrearages in installment payments.[86] And § 1123(b)(5) prohibits modifications of the rights of holders of claims secured solely by a debtor's principal residence. For the reasons stated above, curing mortgage arrearages in installment payments effectuates an impermissible modification of the creditor's contractual rights. Whether it is good policy to differentiate the treatment of home mortgages in chapter 11 and 13 cases is a matter for Congress to decide, not the courts.

In *LaPorta*, the bankruptcy court makes three additional arguments beyond the ones in *Lennington* in support of its conclusion that § 1123(b)(5) permits a plan to provide for a cure of arrearages on a home mortgage loan in installments. *In re LaPorta*, 578 B.R. 792 (Bankr. N.D. Ill. 2017). First, the *LaPorta* court reasons,

> [T]he absence of a [] provision in Chapter 11 [similar to § 1322(b)(5)] is not an indication that cure in installments is not permitted. . . . Chapter 13 places strict limits on the length of a plan not found in Chapter 11. A bankruptcy court may not approve a period for payments under a Chapter 13 plan that is longer than 5 years. . . . Section 1322(b)(5) provides a mechanism to cure and maintain a long-term debt within the maximum five-year term of the plan even though repayment of the remaining portion of the debt will extend beyond that term. Such a mechanism plainly is not needed for the more flexible Chapter 11, where even a long-term debt can be provided for 'within' the plan.

*Id.* at 799 (internal quotation marks omitted). But these and other differences between chapter 11 and chapter 13 support the opposite conclusion. An immediate cure of loan arrearages is more necessary to protect a mortgage lender in chapter 11 than in chapter 13 because chapter 11 does not contain chapter 13's safeguards, including a maximum repayment period of five years,

---

[86] *See* discussion, page 17, *supra*.

curing arrearages in equal monthly payments, and maintaining mortgage payments during the pendency of the bankruptcy case prior to plan confirmation.

Second, the *LaPorta* court states that it is notable that the 1994 Amendment adding § 1123(d) specifies the amount needed to cure a default but does not address the time in which the cure must be made, suggesting that this means payment of arrearages in installments does not violate § 1123(b)(5)'s anti-modification prohibition. 578 B.R. at 799-800. Section 1123(d) is chapter 11's counterpart to § 1322(e).[87] Yet, whether payment of arrearages in installments violates § 1322(b)(2)'s anti-modification prohibition is governed by § 1322(b)(5), not § 1322(e), which only addresses the amount necessary to cure the default. Like § 1322(e), § 1123(d) does not address the time in which the cure must be made. Adding a chapter 11 provision that is parallel to § 1322(e) has no bearing on whether a cure may be made in installments without violating § 1123(b)(5)'s anti-modification prohibition.

Finally, the *LaPorta* court quotes *In re Clark,* 738 F.2d 869, 871-72 (7th Cir. 1984) for the proposition that it was 'clear that Congress intended "cure" to mean something different from "modify" because the "cure of a past default and de-acceleration was 'not a form of modification banned by [Section 1322(b)(2)][88] but rather is a permissible and necessary concomitant of the power to cure default.'" *LaPorta,* 578 B.R. at 798-99 (quoting *Clark*). *LaPorta* then reasons that

---

[87] Section 1322(e) provides:
> Notwithstanding subsection (b)(2) of this section and sections 506(b) and 1325(a)(5) of this title, if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

Section 1123(d) provides:
> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

[88] *Clark* cited § 1322(b), not § 1322(b)(2). 738 F.2d at 872. Section 1322(b)(5) expressly permits a cure in installments under a chapter 13 plan without violating the modification banned by § 1322(b)(2).

-32-

the same is true of § 1123(b)(5) because the language of §§ 1123(b)(5) and 1322(b)(2) are the same.

The issue in *Clark* was not whether a debtor can make cure payments in installments but whether a chapter 13 debtor is entitled under the Code to "cure" a default on a residential mortgage loan after a prepetition state court foreclosure judgment has been entered. 738 F.2d at 870. This Court agrees that Congress intended "cure" to mean something different from "modify." The terms are not synonymous. This Court also agrees that a cure of a past default and de-acceleration is a permissible and necessary concomitant of the power to cure a default. But that does not mean a chapter 11 debtor can cure arrearages in post-confirmation installments on a home mortgage loan. As explained above, in chapter 11 cases only if the cure is completed before the plan goes into effect and the plan does not otherwise modify the rights of the holder of the claim, the plan does not modify the rights of the holder of the claim in violation of § 1123(b)(5).

D.    <u>"Cause" exists under § 1112(b) to convert or dismiss this case</u>

The Court concludes that "cause" exists under § 1112(b) to convert or dismiss Debtor's chapter 11 case. Debtor has been in this chapter 11 case for close to three years during which time he has made no payments to DLJ. Arrearages on his home mortgage accumulating post-petition alone exceed $50,000. The Second Amended Plan cannot be confirmed because it impermissibly modifies DLJ's contractual rights in violation of § 1123(b)(5). The Second Amended Plan proposes to pay the almost $200,000 of preconfirmation arrearages to DLJ, secured by the Mortgage, at the rate of less than $420 per month instead of proposing payment of the arrearages in full by the effective date of the plan. Under these circumstances, the unconfirmability of the Second Amended Plan constitutes cause for dismissal or conversion

-33-

under § 1112(b). *See In re Sunflower Racing, Inc.*, 226 B.R. 665, 669 (D. Kan. 1998) ("A debtor's failure to propose a confirmable plan or the bankruptcy court's denial of confirmation constitutes cause under section 1112(b)(2).") (citations omitted); *In re Autterson*, 547 B.R. 372, 409 (Bankr. D. Colo. 2016) ("Cause" for dismissal existed where debtor "failed, during two years of bankruptcy proceedings, to confirm a plan of reorganization—and no successful reorganization appear[ed] likely in any reasonable timeframe."); *In re Am. Capital Equip., Inc.*, 405 B.R. 415, 426-27 (Bankr. W.D. Pa. 2009) (determining that conversion of chapter 11 case was appropriate based on ruling that the plan was unconfirmable and stating that unconfirmability of a plan remains a viable basis for conversion because § 1112(b)'s examples of cause are not an exhaustive list); *In re Nat'l/Northway Ltd. P'ship*, 279 B.R. 17, 23 (Bankr. D. Mass. 2002) ("[A] court should address the question of unconfirmability in analyzing a request to dismiss [under § 1112(b)].").[89]

Debtor has not demonstrated any "unusual circumstances" that would qualify as an exception to mandatory dismissal or conversion upon a finding of "cause." § 1112(b)(2). Further, Debtor has not shown a "reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time." *Id.*; *see also Hall v. Vance*, 877 F.2d 1041, 1044 (10th Cir. 1989) (concluding that the debtors' "failure to file an acceptable plan over eight months indicate[d] that . . . the debtors would be unable to formulate an acceptable plan in the future"); *Autterson*, 547 B.R. at 409 (concluding that "the structural alignment of the claims against the Debtor and the history of this case demonstrate that confirmation is exceedingly unlikely").

---

[89] *See also Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) ("Dismissal . . . is appropriate where the debtor's failure to file an acceptable plan after a reasonable time indicates its inability to do so whether the reason for the debtor's inability to file is its poor financial condition, the structure of the claims against it, or some other reason."); *Muth v. Muth (In re Muth)*, 2014 WL 1712527, at *7 (10th Cir. BAP 2014) (inability to fund a confirmable plan constituted sufficient grounds to dismiss case).

-34-

E.    Dismissal vs. Conversion

Although the Motion seeks alternative relief, at closing argument, counsel for the United States Trustee requested dismissal of Debtor's bankruptcy case rather than conversion to chapter 7. Whether to dismiss or convert depends on which remedy is "in the best interests of creditors and the estate," § 1112(b)(1), and requires the Court to exercise its discretion based upon the totality of the circumstances. *Autterson*, 547 B.R. at 409. A moving party's preference for dismissal rather than conversion is relevant to the Court's ultimate determination of whether to dismiss or convert the case to chapter 7. *See Autterson*, 547 B.R. at 409 ("The Court starts with the positions of the parties."); *In re Van Eck*, 425 B.R. 54, 67 (Bankr. D. Conn. 2010) ("Presumably, the parties will be the best judge of their own best interests, and if all of the parties agree on one course of action, the court should accommodate their desire." (quoting 7 *Collier on Bankruptcy* ¶ 1112.04[7] (Richard Levin & Henry J. Sommer eds., 16th ed.)). The Court agrees that dismissal of Debtor's chapter 11 case is in the best interest of creditors and the estate. Debtor's primary creditor is DLJ. No other creditor has actively participated in this bankruptcy case. The Court already has modified the automatic stay with respect to DLJ's *in rem* claim. Debtor has appealed the Foreclosure Judgment in the State Court Action. That appeal is stayed under § 362(a). Dismissal of this bankruptcy case will result in the appeal moving forward, and resolution of that appeal is key to the ultimate resolution of Debtor's dispute with DLJ.

Based on the foregoing, the Court will dismiss Debtor's bankruptcy case for "cause" under § 1112(b). The Court will enter a separate dismissal order in accordance with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: October 14, 2022

COPY TO:

Michael Jacques Jacobs
800 Calle Divina NE
Albuquerque, NM 87113

Ruby Jacobs
800 Calle Divina NE
Albuquerque, NM 87113

Jaime A. Pena
Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103-0608

Elizabeth Dranttel
Attorney for DLJ Mortgage Capital, Inc.
Rose L. Brand & Associates, PC
7430 Washington Street NE
Albuquerque, NM 87102

-36-